UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

CORY DAVIS, a seaman,

Plaintiff,

v.

JAMES BRUNSMAN, an individual; and
ROCKY ERTZBERGER, an individual,

Defendants.

_____

Case No. 3:19-cv-01221-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff, Cory Davis, ("Davis"), filed this lawsuit against defendants James Brunsman ("Brunsman") and Rocky Ertzberger ("Ertzberger") seeking damages for injuries he suffered while working on the fishing vessel, the F/V ALERT ("ALERT"), as well for as maintenance, cure, and wages. Davis filed a motion to compel cure ("Motion") asking the court to direct Brunsman, the owner of the ALERT, to "immediately authorize the cervical spinal surgery prescribed by [Davis's] treating orthopedic surgeon." (Plf.'s Mot. to Compel Cure, ECF No. 34, ("Mot."), at 2.)

PAGE 1 - OPINION AND ORDER

The court finds Davis's motion raises issues of initial entitlement to cure for Davis's current cervical spine condition and should be considered under a summary judgment standard. Because genuine issues of material fact exist with respect to the initial cause of Davis's condition and its relation to the incident on the ALERT, the Motion is denied.[1]

Having denied Davis's motion, the court elects the alternative of an expedited, bifurcated trial on these issues:  1) the proper diagnosis of Davis's current condition; 2) whether Davis's current condition is related his service on the ALERT; and 3) the medical necessity of the recommended cervical spine surgery.

*Background*

Davis began working as a deckhand aboard the ALERT in May 2018.  Toward the end of a fishing trip in mid-August 2018, the vessel's engine malfunctioned.  Ertzberger owned a fishing vessel, the F/V ELVAGENE ("ELVAGENE"), which began towing the ALERT to port when, on August 22, 2018, the weather quickly turned bad.  The resulting swells and rough seas damaged the ALERT and forced the crew of the ALERT to cut the tow lines to save the ELVAGENE.  The ALERT laid over and sunk shortly thereafter.  Davis suffered various injuries as a result of the August 22, 2018 incident ("Incident").

I.  The Incident

On August 22, 2018, as the storm worsened and after the tow lines were curt, the ALERT deckhands, Andrew Elmenhurst ("Andrew"), Patrick Elmenhurst ("Patrick"), Ty Round

---

[1] The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

("Round") and Davis, gathered in the galley. (Andrew Elmenhurst Dep.[2] 111:8-19; Round Dep.[3] 77:1-13.) When the ALERT started to tip, Andrew, Patrick, and Round exited the galley. (Andrew Elmenhurst Dep. 113:18-22; Patrick Elmenhurst Dep.[4] 81:6-10; Davis Dep.[5] 33:24-34:13.) Davis then attempted to exit the galley, but the ALERT lurched to the side and the sliding door closed in Davis's face. (Davis Dep. 36:18-24.)

### A. Davis's Testimony

According to Davis, he was unable to open the door by pushing or pulling or get to the door on the other side of the galley because of the water flooding the galley. (Davis Dep. 41:16-25, 38:15-17.) He then tried to kick the sliding door open but became pinned between the stove and the table. (Davis Dep. 42:3-7.) Davis got away from the table, punched through the glass of the sliding door, wrenched the door open, pulled himself through the door with water rushing in, and swam to the surface. (Davis Dep. 42:9-43-4.)

Davis testified that while swimming in the ocean waiting to be rescued by the ELVAGENE, he was "sucked" under water by the sinking ALERT. He "kept trying to get to the surface and it kept feeling like it was getting farther away," his "vision started to tunnel," "[e]verything slowed down," he saw a "pin light" and got a "euphoric feeling" which scared him

---

[2] Excerpts from the deposition transcript of Andrew Elmenhurst, taken August 24, 2020, are attached as Exhibit A to the Carey Decl., ECF No. 35-1, and Exhibit C to the Folawn Decl. ECF No. 46 at 29-40.

[3] Excerpts from the deposition transcript of Ty Round, taken September 16, 2020, are attached as Exhibit L to the Carey Decl., ECF No. 35-12, and Exhibit D to the Folawn Decl., ECF No. 46 at 42-73.

[4] Excerpts from the deposition transcript of Patrick Elmenhurst, taken August 31, 2020, are attached as Exhibit C to the Carey Decl., ECF No. 35-3, and Exhibit A to the Folawn Decl. ECF No. 46 at 5-11.

[5] Excerpts from the deposition transcript of Corey Davis, taken May 19, 2020, are attached as Exhibit D to the Carey Decl., ECF No. 35-4, and Exhibit B to the Folawn Decl. ECF No. 46 at 13-27.

and caused him to start kicking for what felt like "forever."  (Davis Dep. 82:1-8, 84:12-85:3.)
When he again reached the surface, he claimed he saw the ELVAGENE coming straight toward
him.  (Davis Dep. 85:2-6.)

   *B. Patrick's Testimony*

   Patrick described Davis as a "storyteller" who told inconsistent stories that Patrick learned
to take "with a grain of salt" and eventually ignored.  (Patrick Dep. 117:13-118:16.)  While Davis's
medical records reflected his claim of having been sucked down by the ALERT and struck by the
ELVAGENE, Patrick testified he was able to see Davis while Davis was in the water and did not
see either of those events, and he reiterated Davis would embellish stories when talking about his
past.  (Patrick Dep. 164:5- 165:14.)

   *C. Andrew's Testimony*

   Andrew similarly described Davis as someone who embellished and told "stories that were,
you know, seemingly impossible."  (Andrew Dep. 217:9-22.)  Andrew, like Patrick, disputed
Davis's report he was hit in the head by the ELVAGENE, adding that Davis had no marks, cuts,
or lacerations on his head or face and explaining that if the ELVAGENE hit someone at the speed
it was moving, the person would not have survived.  (Andrew Dep. 214:2-215:4.)  He also
challenged Davis's claim he was temporarily under water in the galley, because Davis "was outside
of the galley on the side of the boat before the cabin would have been submerged under water."
(Andrew Dep. 155:3-11.)  Andrew, who served as the cook for the ALERT and spent much of his
time in the galley, also refuted Davis's claim of being pinned by the galley table, because it "was
bolted to the floor and the way that the boat rolled was not a violent or quick motion in regards to
what it would take to – to, like, thrust a table that was bolted onto the ground on to Cory."  (Andrew

Dep. 215:13-216:7.)  Finally, Andrew testified Davis was in the water for a total of approximately two minutes.  (Andrew Dep. 142:10-17.)

*D.  Round's Testimony*

Round also considered Davis a "bit of a storyteller," as well as a "people pleaser," and admitted he doubted his trustworthiness "a little bit."  (Round Dep. 117:4-22; 119:1-3.)  Round confirmed the galley door closed before Davis was able to exit the galley but testified that he helped Davis slide the door open and Davis was out of the galley within twenty-to-thirty seconds of Round's exit.  (Round Dep. 78:20-79:13, 79:24-80:1, 88:4-12.))  Round denied Davis had to break glass or punch his way out, or that the galley was under water as Davis made his way out. (Round Dep. 79:14-23. 80:2-8.)  He also stated Davis was "right beside me all the way to the ELVAGENE" and on a floating device, and that he never saw Davis go under the water.  (Round Dep. 83:12-25, 84:6-21.)  Finally, he stated Davis "was never hit on the head" and "was never anywhere near the bow" of the ELVAGENE.  (Round Dep. 124:25-125:10, 151:2-12.)

## II.  Davis's Injuries and Medical Records

Davis was rescued and taken aboard the ELVAGENE.  While travelling to Seattle, Washington, Davis vomited salt water, had trouble keeping things in his stomach and was not interested in eating or drinking liquids.  (Brunsman Dep.[6] 220:18-221:4; Davis Dep. 120:6-121:23.)  Upon arriving at port in Seattle, Washington, late in the evening of August 23, 2018, Davis was taken to the emergency room, where he complained of hand and arm lacerations, nausea, vomiting, full body pain, and a headache, but specifically denied neck pain.  (Ertzberger Dep.[7]

---

[6] Excerpts from the deposition transcript of James P. Brunsman, taken May 27, 2020, are attached as Exhibit B to the Carey Decl., ECF No. 35-2.

[7] Excerpts from the deposition transcript of Rocky Ertzberger, taken May 28, 2020, are attached as Exhibit E to the Carey Decl., ECF No. 35-5.

200:3-6; Carey Decl. dated December 14, 2020, ECF No. 35 ("Carey Decl."), Ex. F at 2, 4.)  He reported multiple pieces of equipment struck him in the head and flank during the Incident.  (Carey Decl. Ex. F at 3.)

Tests revealed Davis was suffering from acute renal failure, but had no acute traumatic injury to his head, chest, or abdomen; no intracranial abnormality; and no hematoma, hemoperitoneum, or other bleeding.  (Carey Decl. Ex. F at 3.)  The medical provider reported a normal range of motion in Davis's neck and, with regard to Davis's cervical spine, noted:  "No focal neurological deficit, no midline, spinal tenderness.  No pain with axial loading or rotation of neck bilaterally, no pain with flexion or extension.  No intoxication.  No distracting injury.  Using nexus criteria, patient C spine cleared clinically."  (Carey Decl. Ex. F at 5.)  Davis was transferred to a hospital the next day for treatment of his renal failure.  (Carey Decl. Ex. F at 3, 44.)

While in the hospital, Davis complained of pain in his right shoulder and neck region.  (Carey Decl. Ex. K at 14.)  Shortly after his discharge, he indicated he was experiencing muscle aches in his upper and lower extremities, but his extremities were "warm and well-perfused" with "no compartment tightness," normal range of motion, and minimal pain with palpation.  (Carey Decl. Ex. K at 19-20.)

On January 26, 2019, it appears Davis completed a "Neck Disability Index"[8] in which he characterized his neck pain as mild, resulting in frequent, moderate headaches; that it made it difficult to look after himself, lift heavy weights, concentrate, work, and sleep; but that it only moderately affected his ability to read, drive, and engage in recreational activities.  (Carey Decl. Ex. K at 22.)  On another health questionnaire, Davis reported frequent pain in his neck but no

---

[8] The line for the name of the patient was blank.

pain in his arms.  (Carey Decl. Ex. K at 41.)  He thereafter participated in regular manual therapy or massage treatments for a month and consistently reported symptom improvement in his neck. (Carey Decl. Ex. K at 23-39.)  In February and April of 2019, Davis reported neck pain to a physical therapist.  (Carey Decl. Ex. K at 49, 50.)

Davis began treatment with Alexander Ching, M.D., an orthopedic spine surgeon ("Dr. Ching"), in May 2019, primarily for his low back and bilateral leg pain, but he also because he reported "neck issues from the accident as well."  (Ching Decl. dated December 8, 2020, ECF No. 37 ("Ching Decl."), ¶ 3.)  Davis elected to continue conservative treatment for his neck and concentrate on his back issues.  (Ching Decl. ¶ 4.)  Dr. Ching recommended and, on August 12, 2019, performed, an anterior lumbar interbody fusion at L5-S1.  (Ching Decl. ¶ 4.)

That same summer, B.J. Scott, Psy. D. ("Dr. Scott"), indicated in a "Therapy Evaluation" that Davis had "neck pain," which Davis attributed to "existing arthritis that was exacerbated in the accident," and Davis similarly reported neck pain to Danielle L. Erb, M.D. ("Dr. Erb"). (Folawn Decl. dated January 11, 2021, ECF No. 46 ("Folawn Decl."), Ex. J at 167; Erb Dep.[9] 49:15, 175:22-23.)  In October 2019, a "Rehab Treatment Note" documented that Davis had radiating pain down his left arm and that a neck MRI revealed arthritis.  (Carey Decl. Ex. K at 58.) Davis reported neck pain to his primary care physician, James P. Molloy, III, M.D. ("Dr. Molloy"), in December 2019.  (Carey Decl. Ex. K at 56.)

In January 2020, Davis began treatment for neck pain with Kathryn Ashley Price, M.D. ("Dr. Price").  On January 9, 2020, Dr. Price noted the onset of the neck pain was "without an

---

[9] Excerpts from the deposition transcript of Danielle L. Erb, M.D., taken October 20, 2020, and November 24, 2020, are attached as Exhibit D to the Neidzwski Decl., ECF No. 49-4.

inciting event," the symptoms became "more prominent after back pain was resolved with surgical intervention," Davis's cervical MRI was "notable for degenerative disc disease and facet arthropathy," and treatment included Gabapentin, cervical epidural, and physical therapy. (Carey Decl. Ex. H at 2-4, 6-7.) Dr. Price indicated Davis exhibited "decreased range of motion, tenderness, bony tenderness, pain, and spasm" in his cervical spine, with minor pulling sensation with cervical flexion in axial neck on the left side only, markedly reduced cervical extension and lateral rotation secondary to pain with reproduction of axial neck pain primarily on the left side. (Carey Decl. Ex. H at 11.)

On February 20, 2020, Dr. Price gave Davis a cervical epidural steroid injection at the C7-T1 interspace. (Carey Decl. Ex. K at 62.) Dr. Price repeated the steroid injection on July 9, 2020, and on August 19, 2020, reported "full resolution of radiating pain into the upper extremity." (Carey Decl. Ex. K at 70.) At that time, Dr. Price diagnosed Davis with "neck pain secondary to cervical spondylosis with overlying myofascial pain." (Carey Decl. Ex. H at 14.) An MRI of Davis's cervical spine dated August 20, 2020, showed "findings of minor disc and facet degeneration with multilevel, mid-cervical, moderate neural foraminal narrowing, left greater than right, with prominent narrowing at the left C6-7 level. (Carey Decl. Ex. J at 10.)

Davis arrived at the emergency room on September 30, 2020, complaining of neck/shoulder pain and migraine headaches.[10] (Davis Decl. dated December 14, 2020, ECF No. 36 ("Davis Decl."), Ex. 1 at 7-11.) In early October 2020, Davis reported his neck pain was worsening, he had less of a positive response to the second steroid injection, and an EMG nerve

---

[10] Davis returned to the emergency room on November 17, December 17, and December 26, 2020, again complaining of neck/shoulder pain and migraine headaches. (Davis Decl. Ex. 1 at 2-6; Neidzwski Decl. dated January 14, 2021, ECF No. 49 ("Neidzwski Decl."), Ex. A.)

conduction study revealed mild neuropathy without radiculopathy appreciated.  (Carey Decl. Ex. H at 15.)  Dr. Price noted the MRI of Davis's cervical spine revealed stenosis at left C6-7, right C4-5 and C5-6, diagnosed Davis with "neck and left upper extremity secondary to cervical radiculitis," and recommended Davis discuss surgical options with Dr. Ching.  (Carey Decl. Ex. H at 15, 17.)

Davis again sought treatment with Dr. Ching, who commented Davis's neck symptoms had become progressively worse and offered his opinion that "based on my knowledge experience and training, by and through my examination of Mr. Davis, with reasonable medical certainty, . . . his neck symptoms are more probably than not due to the August incident aboard the F/V ALERT."  (Ching Decl. ¶¶ 7, 9.)  In a letter dated October 29, 2020, Dr. Ching explained:

> Corey has had neck issues since his accident.  The arm pain has been escalating since his accident, and has been pretty unbearable for the last few months.  He had good relief with injections but they have become less effective over time.  His biggest problem is the arm pain at this point.
>
> I told him I think at this point he should consider surgery.  An operation would be aimed at decompression the C6-7 left foramen which matches his arm symptoms (C7 distribution).  I warned him that this should be reliable for his arm pain that runs down his arm and into his hand.  It is less reliable for neck pain and tension headaches.

(Carey Decl. Ex. J at 7.)  Dr. Ching represented "the cervical surgery is designed to address his neck symptomology and improve Mr. Davis's functional capacity" and "if Mr. Davis does not get surgery, Mr. Davis's function will follow the current trend, which has been worsening function."  (Ching Decl. ¶¶ 10, 11.)  Davis then sought authorization from Brunsman for the surgical procedure.

\ \ \ \ \

\ \ \ \ \

PAGE 9 - OPINION AND ORDER

III.  Brunsman's Denial of Cervical Surgery and Davis's Resulting Motion

In a letter dated November 9, 2020 ("Letter"), Brunsman denied Davis's request to authorize the cervical spinal surgery Dr. Ching recommended, based on the lack of "evidence that Mr. Davis's alleged cervical radiculopathy was somehow caused by or related to the vessel incident of August 2018."  (Carey Decl. Ex. 9 at 1.)  The Letter referenced medical records that showed Davis had "a normal neck range of motion, no tenderness, and no neurological deficits on August 24, 2018;" a few complaints of neck pain before January 2019, which resolved with massage and thus indicated the pain was muscular and unrelated to the cervical spine; and initial complaints of pain radiating down his left arm with a diagnosis of cervical radiculitis in January 2020.  (Carey Decl. Ex. 9 at 1-2.)  While acknowledging "[i]n the past, in an abundance of caution, Mr. Brunsman has authorized – without prejudice – an enormous amount of physical therapy and medical treatment, including injections, even when it appeared to have no relation to the vessel incident of August 2018," Brunsman asserted that his "charitable approach, erring to date on the side of authorizing treatment, is not without its limits."  (Carey Decl. Ex. 9 at 2.)  He also stated: "The Ninth Circuit has recognized that a district court may sever the issue of maritime benefits and hold an expedited trial under FRCP 42(b)," citing *Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 539 (9th Cir. 2018), and indicating Brunsman would not oppose a request by Davis for a bifurcated, expedited trial on maintenance and cure.  (Carey Decl. Ex. 9 at 2.)

In response, Davis filed the Motion, in which he argued Brunsman's "continued refusal to authorize surgery for [Davis's] neck after paying for all prior neck treatment constitutes an arbitrary and capricious denial of cure" and "reliance on a hired expert to deny ongoing cure fails to meet the unequivocal evidence standard that governs this motion."  (Mot. at 2.)  Brunsman asserts the summary judgment standard governs the Motion and that genuine issues of material

PAGE 10 - OPINION AND ORDER

fact exist with respect to medical causation, relatedness, and necessity, and if the court concludes these factual issues should be resolved in an expedited manner, then the court should order an expedited, bifurcated trial on cure.

IV.  Medical Opinions

Brunsman's opposition to the Motion includes opinions from various physicians who address the likely cause of Davis's neck issues and opine on the necessity of the recommended surgical intervention.  Lawrence Murphy M.D. ("Dr. Murphy"), reviewed Davis's medical records and concluded "the cervical spine fusion is not warranted with this patient," that "even if it were warranted, it was not necessitated by the vessel incident of August 2018," and "given his clinical examinations, results on imaging studies, and his negative electrodiagnostic testing, a delay in surgery would not leave Mr. Davis at greater risk for impairment or reduce the chance of a successful surgery in the future." (Murphy Decl. dated January 6, 2021, ECF No. 44 ("Murphy Decl.") ¶¶ 24, 25.)  Dr. Murphy noted Davis "had pre-existing neck problems," "both cervical and lumbar spine imaging post-event revealed chronic degenerative changes," and "Mr. Davis appears to have suffered temporary spine strain, limb bruising and lacerations, due to the August 2018 incident."  (Murphy Decl. Ex. B at 34.)  Dr. Murphy refuted Dr. Ching's notation in May 2019 that Davis had neck issues from the Incident because of the lack of reported neck, cervical spine, or upper extremity complaints; signs or symptoms of cervical radiculopathy; or examinations of Davis's cervical spine or upper extremities.  (Murphy Decl. ¶ 7.)

Dr. Murphy considered the lack of consistent reports of radiating symptoms into Davis's upper extremities and regular normal neck exams immediately after the Incident and through June 2019 as evidence that Davis's diagnosed cervical radiculopathy was not related to the Incident, because "traumatically induced cervical radiculopathy occurs at the time of, or shortly after, a

PAGE 11 - OPINION AND ORDER

traumatic incident." (Murphy Decl. ¶¶ 8-11.) Dr. Murphy explained cervical spine surgery is generally not recommended for neck pain or headaches, Davis's improvement from steroid injections is not indicative of cervicogenic radiculopathy which would benefit from fusion surgery, the lack of significant changes between Davis's 2019 MRI and 2020 MRI establish Davis's neck issues had not worsened, and Davis's EMG did not reveal evidence of nerve compression or cervical radiculopathy, but instead revealed carpal tunnel syndrome. (Murphy Decl. ¶¶ 13-15.)

Dr. Murphy reviewed and aptly summarized the report of Russell Vandenbelt, M.D., ("Dr. Vandenbelt") as follows:

> Dr. Vandenbelt concluded that Mr. Davis "no longer has any clinical diagnosis related to the incident," "his symptoms fairly rapidly improved with mental health treatment," "he now has no clinically significant symptom difficulties," he has "reached a point of maximum medical improvement related to his trauma related mental health symptoms in March 2019, based on the documentation," and he "is not in need of any further mental health evaluation or treatment for any condition or symptom related to his boating incident." Dr. Vandenbelt also noted that Mr. Davis has a preoccupation with symptoms, hypochondriacal tendencies, and adoption of a "sick role": that is, Mr. Davis being convinced he is ill and disabled, when this is not the case. Such patients are prone to symptom exaggeration, and these preoccupations are generally a contraindication for surgery.

(Murphy Decl. ¶ 19, Ex. C.) Dr. Murphy noted that with patients, such as Davis, who exhibit both an adopted "sick role" and a "disability identity," "the likelihood of a successful surgical outcome is markedly reduced." (Murphy Decl. ¶ 19.)

Dr Murphy also reviewed the expert report authored by Elizabeth Ziegler, Ph. D. ("Dr. Zeigler"), who conducted a neuropsychological evaluation of Davis on July 29, 2020. (Murphy Decl. ¶ 20.) Her report, he noted, contained "severe contraindications for the proposed surgery":

> The conclusions in Dr. Ziegler's neuropsychological evaluation of Mr. Davis also raise troubling concerns that represent significant contraindications for the surgery proposed by Dr. Ching. Dr. Ziegler examined the raw data from the neuropsychological testing that was conducted by Mr. Davis's treating psychologist, Dr. B.J. Scott. Dr. Ziegler noted that Mr. Davis "failed an embedded

validity indicator" and that his scores were "highly consistent with known malingering groups." In addition, his performance on the Minnesota Multiphasic Personality Inventory resulted in a raw score of 30 and a T-score of 98, which "is concrete evidence of exaggeration." Mr. Davis's Response Bias Scale results was also "consistent with exaggeration." According to Dr. Ziegler, Mr. Davis's responses indicate a significant somatic focus:

> Based on his responses, he is likely experiencing severe personality deterioration and is likely to have problems with intense anxiety, somatic distress, agitation, and anger. He may also have many problems caused by general ineffectiveness in dealing with life. His premorbid adjustment was probably poor, and the present agitated state is likely to be only an intensification of previous problems. Additionally, he is likely to "demand much attention for his somatic complaints, which may have a distinctly bizarre flavor, and he may be delusional about his health." He may appear somewhat suspicious and distrustful. Based on the content scales, his pattern of responses indicates difficulty managing routine affairs, and the items he endorsed suggest a poor memory, concentration problems, and an inability to make decisions. He appeared to be immobilized and withdrawn and have no energy for life. He views his physical health as failing and report numerous somatic concerns.

> From a neurological standpoint, Dr. Ziegler's ultimate conclusions underscore, and more fully define, the issues that represent severe contraindications for the proposed surgery. Dr. Ziegler diagnosed Mr. Davis with malingered neurocognitive dysfunction. Put plainly, such a diagnosis is a red flag. If I were aware that my patient was diagnosed with malingered symptoms, in concert with a "disability identity" and tendency to turn psychological issues into physical complaints, I would not recommend cervical fusion surgery and, in fact, would see it as ill-advised. This is particularly true when considering Mr. Davis's history — reflected in the medical records discussed in the preceding paragraphs of this declaration.

(Murphy Decl. ¶ 20.)

In her declaration, Dr. Zeigler expressed "serious reservations about Mr. Davis undergoing such a procedure, due to his apparent symptom magnification, which has been especially significant for numerous physical complaints, and somatic focus," explaining "[s]ymptom magnification and somatic focus can be contraindications for a successful surgery outcome." (Ziegler Decl. dated January 5, 2021, ECF No. 45 ("Ziegler Decl."), ¶¶ 2, 5, Ex. B.) If the surgery

PAGE 13 - OPINION AND ORDER

was deemed medically necessary, Dr. Zeigler recommended that Davis participate in a "pre-surgical psychological evaluation with a specific focus on biopsychosocial assessment to identify risks that might compromise Mr. Davis's ability to benefit from such a procedure" with particular attention given to symptom exaggeration.  (Ziegler Decl. ¶ 6.)

Dr. Murphy also reviewed the deposition transcripts of some of Davis's treating physicians, including Dr. Molloy, B.J. Scott, Psy.D. ("Dr. Scott"), and Charles W. Webb, M.D. ("Dr. Webb"), which he believed supported the diagnoses of symptom magnification, somatic focus, and disability conviction, all contraindications for spine surgery.  (Murphy Decl. ¶ 22.)  He specifically addressed the testimony of Dr. Scott, commenting: "Her opinions regarding Mr. Davis's complaints portend of a bad outcome from the surgery proposed by Dr. Ching.  Of particular concern is her conclusion that Mr. Davis's current conditions relate to a "disability identity" that has entered his "clinical picture," and which he needs to reverse his "habits of mind of chronic pain and [post-traumatic stress disorder]."  (Murphy Decl. ¶ 22.)  Dr. Murphy opined: "It appears that Dr. Ching is unaware of these issues, and these may well have substantial impact on his decision to proceed with surgery.  (Murphy Decl. ¶ 22.)

Dr. Scott testified "reinforcement of disability identity" had recently entered Davis's clinical picture and she had not yet had a chance to address it in therapy.  (Scott Dep.[11] 41:14-21.) She agreed this condition could cause a patient who was "feeling something or experiencing something, [to] attribute it to something it might not be attributable to," or "feel something or

---

[11] Excerpts from the deposition transcript of BJ Scott, Psy.D., taken November 17, 2020, are attached as Exhibit G to the Folawn Decl., ECF No. 46 at 105-121, and as Exhibit F to the Neidzwski Decl., ECF No. 49-6.

express something to a provider that is larger than what they're actually experiencing." (Scott Dep. 41:2-13.)

In his deposition, Dr. Molloy confirmed Davis's headaches resolved with massage therapy. (Molloy Dep.[12] 54:1-6.) Dr. Molloy explained headaches that improve with massage are typically caused by tight muscles – a muscle contraction or muscle tension – in the erector spinae and all the way up to the base of the skull. (Molloy Dep. 45:7-46:2.) Dr. Molloy could not opine on whether Davis's headaches were caused by the Incident. (Molloy Dep. 50:7-10.) With respect to Davis's complaints in December 2019 of pain at level nine on a scale of one-to-ten, with ten being the "worst pain you can possibly imagine," Dr. Molloy reported the physical assessment revealed the pain was related to "muscle spasms in his neck, back, and in his legs." (Molloy Dep. 64:13-65:1.) When questioned about the new diagnosis of "cervical disk disorder with myelopathy, unspecified cervical region," Dr. Molloy noted Dr. Ching made the diagnosis after an evaluation and nerve conduction studies, and "based on that, it was felt that he had a cervical radiculopathy, causing upper extremity weakness, and that they were going to pursue surgery. (Molloy Dep. 68:8-19.) Dr. Molloy could not find any connection between the Incident and the cervical radiculopathy diagnosis. (Molloy Dep. 68:20-69:11.)

Dr. Webb eventually diagnosed Davis with cervical spondylosis and cervical radiculitis based on MRIs, imaging, and the "subjective symptoms that he's having down his arm." (Webb

---

[12] Excerpts from the deposition transcript of James Molloy, M.D., taken November 3, 2020, are attached as Exhibit F to the Folawn Decl., ECF No. 46 at 86-103, and as Exhibit G to the Neidzwski Decl., ECF No. 49-7.

PAGE 15 - OPINION AND ORDER

Dep.[13] 32:14-24.)  Dr. Webb found no objective medical evidence to tie the complaint of neck pain

to the Incident.  (Webb Dep. 31:6-10.)

Davis also offered deposition excerpts from his treating physicians in support of his reply

brief.  Dr. Erb opined the swelling and pain in Davis's forearms resulting from myofascial tension

were caused by the Incident and testified: "The back and neck pain are partially pre-existing,

partially aggra – for the neck, an aggravation of a previous injury with the cervical strain that

occurred in '18, and the aggravation also in the lumbar spine.  So those are a combination of pre-

existing and present.  And those are, I believe, related to the injury of 2018."  (Erb. Dep. 229:23-

230:11.)  Dr. Erb and Dr. Webb represented they did not believe Davis was making up, or

exaggerating, his symptoms or malingering.  (Erb Dep. 262:13-263:2; Webb Dep. 107:9-108:2.)

Dr. Scott did not believe Davis was "intentionally faking."  (Scott Dep. 109:12-18.)

*Legal Standard*

I.  Applicable Legal Standard

It is apparent from the briefing, and representations by the parties at the scheduling

conference, that the primary issue before the court is the applicable legal standard.  Davis contends

that once a shipowner initiates payment for maintenance and cure, the shipowner must produce

unequivocal medical evidence to terminate such benefits, with any ambiguities or doubts to be

resolved in the seaman's favor.  Brunsman argues a seaman bears the burden to prove the injury

"occurred, was aggravated by, or became manifest while in service of the vessel" and "because a

motion to compel cure essentially allows a party to obtain a pre-trial judgment, courts routinely

---

[13] Excerpts from the deposition transcript of Charles W. Webb, M.D., taken October 26, 2020, 2020, are attached as Exhibit I to the Folawn Decl., ECF No. 46 at 127-137, and as Exhibit E to the Neidzwski Decl., ECF No. 49-5.

hold that a motion to compel maintenance and cure should be considered under a summary judgement standard." (Opp's to Pl.'s Mot. to Compel a Cervical Fusion Surgery as Maritime Cure, ECF No. 43 ("Opp'n"), at 19.)

"Under the general maritime law, a seaman who falls ill or becomes injured while in the service of a ship is entitled to 'maintenance and cure' by his employer. This right includes (1) 'maintenance'—a living allowance for food and lodging to the ill seaman; (2) 'cure'—reimbursement for medical expenses; and (3) 'unearned wages' from the onset of the injury until the end of the voyage." *Lipscomb v. Foss Maritime Co.*, 83 F.3d 1106, 1109 (9th Cir. 1996) (internal citations omitted). A shipowner's obligation to provide maintenance and cure to an injured seaman is among "the most pervasive of all" and "when there are ambiguities or doubts, they are resolved in favor of the seaman." *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962). However, a seaman's right to cure is not unlimited and continues only "until he reaches maximum medical recovery." *Id.* at 531. Moreover, "the maintenance and cure duty does not extend to treatment which is only palliative in nature and 'results in no betterment in the claimant's condition.'" *Edmond v. Offshore Specialty Fabricators, Inc.*, Civil Action No. 08-2309, 2009 WL 1459701, at *2 (E.D. La. May 26, 2009) (quoting *Rashidi v. Am. President Lines*, 96 F.3d 124, 128 (5th Cir. 1996)); *see also Stanovich v. Jurlin*, 227 F.2d 245, 246 (9th Cir. 1955).

A seaman has the initial burden to prove he is entitled to maintenance and cure by showing: "(1) he was working as a seaman[;] (2) he became ill or injured while in the vessel's service[;] and (3) he lost wages or incurred expenditures relating to the treatment of the illness or injury." *West v. Midland Enter., Inc.*, 227 F.3d 613, 616 (6th Cir. 2000). The second element encompasses "'any illness or injury which occurred, was aggravated, or manifested itself while the seaman was in the ship's service.' However, '[a] seaman whose illness or injury manifests itself after conclusion of

PAGE 17 - OPINION AND ORDER

his or her employment with the shipowner is generally not entitled to recover for maintenance and cure absent convincing proof of causal connection between the injury or illness and the seaman's service." *Minks v. AEP River Operations, LLC*, Civil Action No. 09-543-JGW, 2012 WL 1142932, at *4 (S.D. Ohio April 5, 2012) (quoting *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 52 (2d Cir. 2004)); *see also Messier v. Bouchard Transportation*, 688 F.3d 78, 84 (2d Cir. 2012) ("so long as the illness occurred or became aggravated during the seamen's service, he is entitled to maintenance and cure.").

Once a seaman establishes he is entitled to maintenance and cure, the shipowner must pay for the injured seaman's medical expenses until he reaches maximum cure. *Hedges v. Foss Maritime Co.*, No. C10-5046 RBL, 2015 WL 402809, at *2 (W.D. Wash. Jan. 29, 2015). Maximum cure is reached when it is medically determined that further improvement in a seaman's health is not reasonably possible. *Vella v. Ford Motor Co.*, 421 U.S. 1, 5 (1975). "If the vessel owner wants to stop paying for the treatment, it must prove unequivocally that the seaman has returned to full health or has attained a state from which he or she will not get any better. *Hedges*, 2015 WL 402809 at *2 (citing *Johnson v. Marlin Drilling Co.*, 893 F.2d 77, 79 (5th Cir. 1990)). Where conflicting medical opinions exist, a shipowner will likely not meet the unequivocal evidence standard. *Hedges*, 2015 WL 402809 at *2 (citing *Tullos v. Resource Drilling, Inc.*, 750 F.2d 380, 388 (5th Cir. 1985)).

The characterization of the questions presented in the relevant pleadings instruct on which standard is applied to the issues presented in the Motion.  Davis's position assumes he has established his entitlement to cure for his cervical injury, while Brunsman posits Davis's entitlement to cure for his cervical injury remains at issue.  The court finds Brunsman's position more accurately describes the issues before the court, based on the record before it.

Davis acknowledges the Ninth Circuit has expressly held a "'seaman's initial entitlement to maintenance and cure . . . can properly be resolved on summary judgment,' and only referenced the possibility of an expedited trial when initial entitlement to maintenance is contested." (Mot. at 14.)(citing *Barnes*, 889 F.3d at 529). He then notes the *Barnes* court "specifically decline[d] to comment on the 'unequivocal evidence' standard when maintenance and cure has already been paid." (Mot. at 14.)

In *Barnes*, the Ninth Circuit addressed the "question that has divided district courts in this circuit [on] the appropriate legal standard to adopt in a pretrial motion for maintenance and cure." *Barnes*, 889 F.3d at 537. The court noted the "inherent tension between the law of admiralty, with its solicitude for seaman," which requires courts to construe claims for maintenance and cure liberally in favor of the seaman, and Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), which instructs the court to consider genuine issues of material fact in light most favorable to the non-moving party. *Id.* The court then concluded the breadth of a shipowner's duty to provide maintenance and cure for a seaman offset the more rigid standards of a summary judgment motion under Rule 56 of the Federal Rules of Civil Procedure. *Id.* at 538. The court explained:

> Despite the tension between Rule 56 and admiralty procedure, the two standards are not incompatible. Although it is ordinarily difficult for a plaintiff to prevail on a motion for summary judgment, the seaman seeking maintenance has an easier task as a result of the breadth of the shipowner's duty. To establish his entitlement to maintenance, the seaman need only prove that he bec[ame] ill or injured while in the service of the ship. The shipowner's duty to pay maintenance arises irrespective of the absence of shipowner negligence and indeed irrespective of whether the illness or injury is suffered in the course of the seaman's employment. [S]o broad is the shipowner's obligation that even negligence or acts short of culpable misconduct on the seaman's part will not relieve (the shipowner) of the responsibility.
>
> In sum, the liberal admiralty policies and correspondingly rudimentary elements of a maintenance claim mean that, in practice, a seaman will have little difficulty demonstrating his entitlement to maintenance under a summary judgment

standard.  Accordingly, [a] seaman's initial entitlement to maintenance and cure can properly be resolved on summary judgment, as evidenced by the numerous federal district courts to have done so.

*Id*. at 538-39 (internal quotation marks, ellipses, and citations omitted).

The Barnes court acknowledged requiring a seaman to prove his entitlement to maintenance and cure under a summary judgment standard "could delay the seaman's recovery of maintenance that is owed him and thereby undermine the remedy's 'easy and ready administration.'"  *Id*. at 538 (quoting *Vella*, 421 U.S. at 4).  It then identified two ways in which this problem could be mitigated.  "First, as we explain, a seaman who demonstrates his entitlement to maintenance and actual expenses need not wait until trial to receive the portion of those expenses to which he is undisputedly entitled.  Second, a district court may on its own or at the seaman's request sever the issue of maintenance and hold an expedited trial on that claim under Federal Rule of Civil Procedure 42(b)."  *Id*. at 539 (citations omitted).

Davis argues *Barnes* is not applicable to his Motion.  He cites for support a footnote in which the Ninth Circuit acknowledged a deviation by "several courts" from the "summary judgment standard where a shipowner unilaterally terminates maintenance payments upon the belief that the seaman has reached maximum cure, leading to the seaman to move to reinstate such payments." *Id*. at 538 n.17.  In that footnote, the *Barnes* court recognized the approach that, "absent a trial, the shipowner must reinstate payments 'unless the shipowner can provide unequivocal evidence that the seaman has reach maximum cure;'" however, the court subsequently explained: "As we are not faced with a motion for reinstatement or a dispute over whether Barnes has reached maximum cure, we do not pass on the appropriateness of the standard adopted by theses courts." *Id*. (citation omitted).  Accordingly, the court neither adopted, nor rejected, the unequivocal evidence standard on which Davis relies.  In any event, there is no evidence Brunsman determined,

PAGE 20 - OPINION AND ORDER

or even argues, that Davis has reached maximum cure or that he terminated maintenance and cure payments as a result of such determination, making the irrelevant the unequivocal evidence standard here, but not so the reasoning and conclusion found in *Barnes.*

Davis apparently equates Brunsman's payment of medical expenses related to his neck pain as relieving Davis of the duty to prove his initial entitlement to cure for such alleged injury and any ailment or malady Davis attributes to it.  However, the evidence before the court reveals Brunsman gratuitously agreed to cover those costs without prejudice; a shipowner's gratuitous payment does not unequivocally establish a seaman's entitlement to maintenance and cure.  Rather, in the absence of the shipowner's clear concession the alleged injury was related to the seaman's employment on its vessel, a court must determine the seaman's initial entitlement to cure before the unequivocal standard applicable to the termination of, or refusal to pay, cure is implicated.  To hold otherwise would encourage shipowners to avoid paying any type of maintenance or cure at the outset, whether or not valid issues related to causation and relatedness existed.

Federal courts in the State of Washington have addressed this question on more than one occasion and generally distinguished between a seaman's initial entitlement to maintenance and cure, and a subsequent motion to reinstate cure after the shipowner has determined the seaman had reached maximum cure.  These cases generally support the conclusion this court has reached here. *See Gouma v. Trident Seafoods, Inc.*, No. C07-1309, 2008 WL 2020442, at *2 (W.D. Wash. Jan 11, 2008) (finding where "there is no dispute that Plaintiff was injured while in service to Defendants' vessel; the dispute centers around the necessity of a medical procedure and whether Plaintiff has reached maximum cure" and plaintiff is entitled to a presumptive continuance of maintenance and cure payments, but when "purely factual question of whether the seaman had been in the service of the vessel when injured was before the court, and the fact of the unresolved

PAGE 21 - OPINION AND ORDER

'service' question was central to the findings, . . . summary judgment was an appropriate basis on which to resolve the issue."); *Mabrey v. Wizard Fisheries, Inc.*, No. C05-1499L, 2007 WL 1556529, at \*2  (W.D. Wash. May 24, 2007) (applying summary judgment standard to motion to compel cure noting "although plaintiff has evidence to support his claim, as set forth above, there is conflicting evidence regarding whether plaintiff suffers from CTA and, if he does, whether it was caused by working on the vessel."); *Buenbrazo v. Ocean Alaska, LLC*,  No. C06-1347C, 2007 WL 772765, at \*4  (W.D. Wash. Feb. 28 2007) (explaining "resolution of all ambiguities and doubts in favor of the seaman does not do away with the seaman's duty to show . . . he was injured or became ill while in the service of the vessel," and concluding "that in spite of the canon of admiralty law that all doubts and ambiguities should be resolved in favor of the seaman, the summary judgment standard should be applied to a pretrial motion to compel maintenance and cure.").[14]

The Washington State Supreme Court similarly distinguished between the initial determination of whether a seaman is entitled to maintenance and cure and a motion to reinstate such benefits when considering the appropriate standard to apply.  *Dean v. Fishing Co. of Alaska, Inc.*, 177 Wash. 2d 399 (2013).  The state court analyzed a number of federal cases, many of which are cited above, and acknowledged "a seaman's initial entitlement to maintenance and cure presents legal questions that can properly be resolved on summary judgment," but found "summary disposition of maintenance and cure claims is generally not appropriate" because the

---

[14] See also *Conger v. K&D Fisheries LLC*, Case No. C17-1270 RSM, 2017 WL 4758762 (W.D. Wash. Oct. 20, 2017) (vacated on reconsideration after transfer to the District of Alaska in 2017 WL 6047688 (W.D. Wash. Oct. 26, 2017) (finding summary judgment standard did not apply to determination of maximum cure and noting summary judgment standard applies only to determine a seaman's initial entitlement to maintenance and cure).

"extent of a seaman's injuries and whether a seaman has reached maximum cure are factual, not legal questions." *Id*. at 410-412. The court further explained "we agree that a court may apply the summary judgment standard to determine a seaman's initial entitlement to maintenance and cure. But it does not necessarily follow that the summary judgment standard must be applied to a seaman's motion to reinstate maintenance and cure." *Id*. at 413. The court concluded:

> We hold that if a shipowner stops paying maintenance and cure to a seaman because it has determined that the seaman has reached maximum cure, a trial court errs by applying a summary judgment standard to a seaman's motion to reinstate maintenance and cure. Instead, after a seaman makes such a motion, the trial court should order the shipowner to reinstate such payments unless the shipowner can provide unequivocal evidence that the seaman has reached maximum cure. Alternatively, if the shipowner wishes to terminate paying maintenance and cure, the shipowner could move for an expedited trial under CR 42(b). At an expedited trial, the shipowner would have the burden to prove, by a preponderance of the evidence, that the seaman had reached maximum cure.

*Id*. at 415.

Judge Aiken of this district court addressed in passing issues similar to those currently before the court in an unpublished opinion issued in *Zimmerman v. F/V Leslie Lee, Inc.*, Case No. 6:13-cv-00048-AA. Zimmerman was injured while working as a deckhand on one of defendant's fishing vessels, was provided medical treatment within five hours of the incident for a "closed-head injury and a stellate laceration," and returned to the vessel for one more fishing trip before leaving defendant's employ. (*Zimmerman v. F/V Leslie Lee, Inc.*, Case No. 6:13-cv-00048-AA Opinion and Order dated July 2, 2013, ECF No. 27 ("*Zimmerman* Opn."), at 2.) Defendant began making maintenance and cure payments upon Zimmerman's departure from the vessel but terminated such payments on March 3, 2013, after obtaining an opinion from a medical expert that Zimmerman reached maximum medical improvement "no later than November 1, 2012."

(*Zimmerman* Opn. at 3-5.)  Zimmerman then filed a motion for pretrial reinstatement of his maintenance and cure benefits.  (*Zimmerman* Opn. at 5.)

Judge Aiken commented the "resolution of this dispute hinges on the applicable standard of review governing pretrial motions for reinstatement of maintenance and cure, brought under general maritime law, where there is conflicting medical evidence relating to whether or when the seaman reached [maximum medical improvement]".  (*Zimmerman* Opn. at 6.)  She noted Zimmerman argued the unequivocal evidence standard enunciated in *Vaughan* controlled while the defendant asserted the summary judgment standard applied.  (*Zimmerman* Opn. at 7.)  Judge Aiken acknowledged "a split of authority exists within the Ninth Circuit regarding the standard of review" but concluded "the application of the summary judgment standard would be incompatible with the principles espoused in *Vaughan*," reasoning that "evaluating a motion for reinstatement of maintenance and cure under the summary judgment standard would contravene bedrock principles of maritime law; under that standard, a shipowner's evidence would automatically and categorically result in termination of the very benefits the seaman previously demonstrated his entitlement to."  (*Zimmerman* Opn. at 9-11.)

Judge Aiken recognized, and rejected, defendant's attempt to rephrase the primary issue from the continuation of benefits to which Zimmerman demonstrated he was entitled to whether Zimmerman's ongoing medical treatment was related to his employment on the fishing vessel, noting defendant raised Zimmerman's preliminary entitlement to maintenance and cure for the first time in its sur-reply brief.  (*Zimmerman* Opn. at 6, n.2.)  She relied on defendant's representation in its opposition brief that the issue before the court was "whether Zimmerman is entitled to additional maintenance and cure after February 29, 2013," and its failure to "file a cross-motion challenging plaintiff's initial entitlement to these benefits or raise this issue prior to its

surreply," in rejecting defendant's attempt to rephrase the issue, explaining that "because defendant failed to properly raise this issue, the Court declines to rule on it, especially in light of the fact that plaintiff has not been afforded an opportunity to respond." (*Zimmerman* Opn. at 6, n.2.)  Additionally, while acknowledging it "is undisputed that a 'seaman's initial entitlement to maintenance and cure presents legal questions that can properly be resolved on summary judgment,'" Judge Aiken specifically noted defendant conceded in its opposition brief "there is no dispute that Zimmerman sustained a head injury aboard the F/V LESLIE LEE on or about February 8, 2012." (*Zimmerman* Opn. at 6, n.2.) (quoting *Dean*, 177 Wash. 2d at 412.)

The defendant later filed a motion for partial summary judgment on Zimmerman's claim for maintenance and cure.  The Honorable Michael J. McShane considered the motion under the summary judgment standard and denied the motion based on the existence of genuine issues of material fact on whether Zimmerman's current conditions were related to injuries sustained on the fishing and whether Zimmerman had reached the point of maximum medical improvement with respect to these conditions.  *Zimmerman v. F/V Leslie Lee, Inc.*, Civ No. 6:13-cv-00048-MC, 2015 WL 8041958 (D. Or. Dec. 4, 2015.)

In the absence of a clear concession Davis's current neck ailments were sufficiently related to his employment on Brunsman's vessel, or a determination by the court to the same effect, Davis's initial entitlement to maintenance and cure for that specific ailment has not been resolved. Consequently, the questions of relatedness and, arguably, medical causation, on which Davis's initial entitlement to cure relies, are issues raised in the Motion, or at least by Brunsman's response to the Motion, to which Davis responded in his reply.  *Barnes* makes clear that summary judgment is the proper vehicle to resolve Davis's initial entitlement to cure for his neck pain.  As noted by various courts, should the existence of genuine issues of material fact with respect to Davis's initial

entitlement exist, one alternative for prompt resolution of this issue is an expedited, bifurcated trial.

## II.  Summary Judgment Standard

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2020).  Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  *Id*. at 324.  A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements.  *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party.  *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982).  All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party.  *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).  Where different ultimate inferences may be drawn, summary judgment is inappropriate.  *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

PAGE 26 - OPINION AND ORDER

However, deference to the nonmoving party has limits.  A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence.  FED. R. CIV. P. 56(c) (2020).  The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

Because the summary judgment standard applies to the issues of causation and relatedness raised Brunsman has raised, and in the absence of his clear concession that Davis's current neck and radiating arm pain are related to his service on the ALERT, the court finds genuine issues of material fact exist regarding Davis's entitlement to cure for his current cervical spine issues, specifically: 1) the proper diagnosis of the cause for Davis's neck and radiating arm pain, 2) whether that condition occurred or became aggravated during Davis's service to the ALERT, and 3) whether the recommended spinal fusion surgery is a necessary and proper cure.  Consequently, Davis is not entitled to summary determination on his demand for cure and his motion is denied.

*Conclusion*

Davis's motion (ECF No. 34) to compel cure is DENIED.  However, the court would be willing to address the issues in an expedited, bifurcated trial, which Brunsman does not oppose.

DATED this 28 day of January, 2021.

JOHN V. ACOSTA
United States Magistrate Judge

PAGE 27 - OPINION AND ORDER